**BOARD OF SUPERVISORS OF WARREN COUNTY, et al., Plaintiffs,**

v.

**VIRGINIA DEPARTMENT OF SOCIAL SERVICES, et al., Defendants.**

**Civ. A. No. 89–0015–H.**

United States District Court,
W.D. Virginia,
Harrisonburg Division.

March 5, 1990.

---

Douglas W. Napier, Napier & Napier, P.C., Front Royal, Va., for plaintiffs.

Thomas J. Czelusta, Kimberly S. Ritchie, Asst. Atty. Gen., Richmond, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Plaintiffs in this action are the Board of Supervisors of Warren County, Virginia,[1] the County Board of Social Services, the County Department of Social Services and Ann Carbaugh, the Director of the County Department of Social Services.[2] There are two institutional defendants—the Virginia Department of Social Services and the Virginia State Board of Social Services—and one individual defendant, Larry D. Jackson, the Commissioner of Social Services.[3] The core of the complaint is the plaintiffs' allegation that the formula adopted by the State Board of Social Services for distributing federal monies under the Social Services Block Grant program (42 U.S.C. § 1397 *et seq.*) among the various local social services agencies is arbitrary and capricious, and not rationally related to a legitimate state purpose. This court has jurisdiction under 28 U.S.C. §§ 1331, 1343. The defendants have moved to dismiss, or in the alternative for summary judgment, raising a number of issues concerning standing and the ability of the present parties to either bring suit or be sued. These issues were briefed, both parties were heard at oral argument on December 21, 1989, and the court has received additional briefs; the defendants' motion is now ripe for disposition.

### I

Perhaps more so than in the average case, the resolution of the issues presently before the court hinges on the nature of each of the parties involved. Therefore, the court will begin with a description of each of the protagonists. The County of Warren (the "County") is a political subdivision of the Commonwealth of Virginia. The Board of Supervisors (the "Board") is a group of elected officials who represent the political body and are charged with managing the ordinary affairs of the county. 5A Michie's Jurisprudence, *Counties* § 31 (1988). The Warren County Board of Social Services ("WBSS") and the Warren County Department of Social Services ("WDSS") are agencies of the County, the creation of which are authorized by state statute. Va.Code §§ 63.1–38, 63.1–38.1. Ann Carbaugh is the Director of WBSS. The defendant Virginia Department of Social Services is a state agency created within the executive department of the Commonwealth. Va.Code § 63.1–1.1. The defendant Larry D. Jackson is the Commissioner of Social Services and is charged with the supervision and management of DSS. *Id.* The defendant State Board of Social Services is also an agency of the Commonwealth. Va.Code § 63.1–14. It is charged with the task of advising the Commissioner. Va.Code § 63.1–24.

Before addressing the defendants' motion it is necessary to determine precisely how the plaintiffs' claims arise, since they may have viable claims in some situations, but not others. In § I of the complaint the plaintiffs state "[t]his action arises under the Constitution and Laws of the United States, including the National Social Security Act in Title XX of the United States Code, The Declaratory Judgment Act, 29 [*sic*] U.S.C. Sections 2201 and 2202, [and] the Civil Rights Act of 1871, 42 U.S.C. Section 1983."

It has long been settled that the Declaratory Judgment Act does not expand this

---

1. In § II of the complaint, which describes the parties, the lead plaintiff is described as the County of Warren as opposed to the Board of Supervisors. Clearly the County must act through the Board of Supervisors, so for present purposes the court will treat the County and the Board of Supervisors as a single entity.

2. Carbaugh is listed in the caption of the complaint but is not included in § II of the complaint which describes the parties. She apparently brings suit only in her official capacity.

3. Apparently Jackson is sued only in his official capacity, though the complaint is not explicit. Plaintiffs in this case seek only prospective, injunctive relief. While a state official may be sued in his individual capacity solely for prospective injunctive relief, *see Mowbray v. Kozlowski*, 724 F.Supp. 404, 406 (W.D.Va.1989), the court need not resolve the issue of what capacity Jackson is sued in since, for Eleventh Amendment purposes, the distinction is only important where the plaintiff also seeks damages. *Compare Wells v. Brown*, 891 F.2d 591, 592 (6th Cir.1989).

court's jurisdiction, but only authorizes a specific type of relief. Thus, clearly, the plaintiffs' claims do not "arise" under the Act. A careful review of both the complaint and the various memoranda filed by the plaintiffs reveals no support for their assertion that any portion of this case arises under the Social Security Act. As a result, the plaintiffs' claims must arise, if at all, under § 1983. They allege that the Commonwealth's distribution formula deprives them of rights under the Due Process and Equal Protection clauses of the Fourteenth Amendment, traditional § 1983 claims. Consequently, the defendants' motion raises a straightforward question: may these plaintiffs bring suit against these defendants under § 1983? Defendants argue that they may not. The plaintiffs argue that they may, in both their own capacities, and in a representational capacity for the citizens of the County.

## II

Defendants' motion involves four basic contentions: (1) that this action is barred by the Eleventh Amendment; (2) that the plaintiffs have failed to state a claim under § 1983 as they are not "persons" entitled to protection under the Fourteenth Amendment and thus (3) lack standing to bring suit under § 1983; and (4) that the institutional defendants are not "persons" under the Fourteenth Amendment and therefore may not be sued under it. Plaintiffs, obviously, maintain that precisely the opposite is true.

### A. *The Eleventh Amendment*

■ The Eleventh Amendment provides: The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States

by Citizens of another State, or by Citizens or Subjects of any Foreign State. While the Amendment does not specifically apply to suits brought against a State by its *own* citizens, the Amendment has "long been held" to govern such actions. *Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 683, 102 S.Ct. 3304, 3313, 73 L.Ed.2d 1057 (1982). Under the Eleventh Amendment a "suit generally may not be maintained directly against the State itself, or against an agency or department of the State, unless the state has waived its sovereign immunity." *Id.* at 684, 102 S.Ct. at 3314; *Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). It is clear, therefore, that unless Virginia has waived its sovereign immunity the Eleventh Amendment requires that the suit against the institutional defendants be dismissed since they are both "agencies or departments" of the State.[4] *Treasure Salvors*, 458 U.S. at 684, 102 S.Ct. at 3314. The plaintiffs contend that such a waiver has taken place.

■ "[A] State will be deemed to have waived its immunity 'only where stated by the most express language or by such overwhelming implication ... as [will] leave no room for any other reasonable construction.'" *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 239–240, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985), quoting *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974). Additionally, the State must note with particularity its intention to waive its immunity from suit in *federal* courts. "The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Atascadero State Hosp.*, 473 U.S. at 241, 105 S.Ct. at 3146. It is not enough that the state have generally waived its sovereign immunity; a state statute or constitutional provision "must

---

**4.** Plaintiffs argue that since this case seeks only declaratory and prospective injunctive relief the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), removes this suit from the restrictions of the Eleventh Amendment. As to the individual defendant the plaintiffs are correct, and Jackson does not join in the motion on the Eleventh Amendment grounds. However, as to the institutional de-

fendants the plaintiffs are clearly wrong. *Ex parte Young* is applicable only to state *officers*, not the state or its agencies. *See Treasure Salvors*, 458 U.S. at 684, 102 S.Ct. at 3314; *Ex parte Young*, 209 U.S. at 159–160, 28 S.Ct. at 453–54. Therefore, absent a waiver, the Eleventh Amendment absolutely bars suits against state agencies irrespective of the type of relief sought.

specify the State's intention to subject itself to suit in *federal court." Id.* "In the absence of an unequivocal waiver specifically applicable to federal-court jurisdiction" this court must decline to find such a waiver. *Id.* The standard for determining waiver is equally strict, if not more so, under Virginia law.

■ Virginia recognizes the doctrine of sovereign immunity, and the Commonwealth's immunity is absolute unless waived. *James v. Jane,* 221 Va. 43, 53, 282 S.E.2d 864 (1980). In Virginia there can be no waiver of sovereign immunity by implication, *Hinchey v. Ogden,* 226 Va. 234, 241, 307 S.E.2d 891 (1983), and statutory language granting consent to suit must be explicitly and expressly announced, *Elizabeth River Tunnel District v. Beecher,* 202 Va. 452, 457, 117 S.E.2d 685 (1961). Plaintiffs argue that by Art. VII, § 3 of the Constitution of Virginia, coupled with Va. Code §§ 15.1–507, 15.1–522 and 15.1–839, the Commonwealth and its agencies and officials have waived their immunity to suits against them by the County. In light of the precedent noted above this is clearly not the case.[5]

■ Article VII, § 3 of the Virginia Constitution states

The General Assembly may provide by general law or special act that any county, city, town, or other unit of government may exercise any of its powers or perform any of its functions and may participate in the financing thereof jointly or in cooperation with the Commonwealth or any other unit of government within or without the Commonwealth. The General Assembly may provide by general law or special act for transfer to or sharing with a regional government of any services, functions, and related facilities of any county, city, town, or other unit of government within the boundaries of such regional government.

There is certainly nothing in this passage which constitutes the express and explicit waiver of immunity required by state law, and, even if there were, it is equally clear that this language does not entail the unambiguous consent to suit in *federal* court mandated by Supreme Court precedent. The statutory sections cited by the plaintiffs are equally unpersuasive.

Section 15.1–507 deals solely with a Board of Supervisors' general powers to act to protect county property and defend suits against the county.[6] Section 15.1–507 grants to boards of supervisors the same powers that are exercised by city and town councils in the Commonwealth, but again makes no reference to sovereign immunity.[7] Section 15.1–839 is a general grant of power to municipal corporations in the Commonwealth, and while its language is broad,[8] it could contain a waiver of immuni-

---

5. In considering the question of waiver, an additional factor which must be kept in mind is the limited nature of a county's power in the Commonwealth. In Virginia, a county is merely an agency or arm of the state government, *Allen v. County School Bd. of Prince Edward County,* 207 F.Supp. 349, 354 (E.D.Va.1962); *Board of Supervisors of King & Queen County v. Cox,* 155 Va. 687, 710, 156 S.E. 755 (1931), and as such has only those powers granted it by the Commonwealth. Virginia follows the Dillon Rule of strict construction concerning the powers of local governments. *Board of Supervisors of Fairfax County v. Miller & Smith, Inc.,* 222 Va. 230, 236, 279 S.E.2d 158 (1981).

6. Section 15.1–507 states:
The governing body of any county may represent the county and have the care of the county property and the management of the business and concerns of the county, in all cases in which no other provisions shall be made and, when necessary, may employ counsel in any suit against the county or in any manner affecting county property when the board is of the opinion that such counsel is needed.

7. Section 15.1–522 states, in part:
The boards of supervisors of counties are hereby vested with the same powers and authority as councils of cities and towns by virtue of the Constitution of the Commonwealth of Virginia or the acts of the General Assembly passed in pursuance thereof.
Plaintiffs have not pointed to any statutory provisions which waive the Commonwealth's sovereign immunity *vis a vis* city or town councils (and therefore, by operation of this section, also as to county boards of supervisors), nor has the court been able to locate any.

8. Section 15.1–839 states:
A municipal corporation shall have and may exercise all powers which it now has or which may hereafter be conferred upon or delegated

ty only by implication, and in Virginia such a waiver by implication is expressly prohibited. *See Hinchey*, 226 Va. at 241, 307 S.E.2d 891.

In light of the narrow construction given to the powers of counties in Virginia, and the absence of any express, explicit, unambiguous language in either the Constitution or general laws of Virginia indicating that the Commonwealth has waived its sovereign immunity and consented to suit in federal court, this court must conclude that the Eleventh Amendment bars any suit against either the State Board of Social Services or the Virginia Department of Social Services.[9] As to these two defendants the motion to dismiss shall be granted.[10]

B. *Can plaintiffs state a claim under § 1983?*

Defendants argue that the plaintiffs are not persons entitled to protection under the Fourteenth Amendment and thus cannot state a claim under § 1983. Plaintiffs counter that, not only do they have their own rights under the Fourteenth Amendment, but that they also may represent the rights of county citizens in this action.

The Fourteenth Amendment states:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

■ It has long been settled that a subdivision of a state is not entitled, as against the state, to the protection of the Fourteenth Amendment. *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933) (a municipality "has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator"); *Newark v. New Jersey*, 262 U.S. 192, 196, 43 S.Ct. 539, 540, 67 L.Ed. 943 (1923) ("The city cannot invoke the protection of the Fourteenth Amendment against the state.") The lower federal courts have routinely held that a political subdivision of a state cannot state a claim under the Fourteenth Amendment against the state. *See County Dep't of Pub. Welfare v. Stanton*, 545 F.Supp. 239, 242 (N.D. Ind.1982) ("the equal protection clause has no application to acts of a state against its own political subdivisions"); *San Diego Unified Port District v. Gianturco*, 457 F.Supp. 283, 290 (S.D.Cal.1978), *aff'd*, 651 F.2d 1306 (9th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982) (it is "beyond doubt that the protec-

---

to it under the Constitution and laws of the Commonwealth and all other powers pertinent to the conduct of the affairs and functions of the municipal government, the exercise of which is not expressly prohibited by the Constitution and general laws of the Commonwealth, and which are necessary or desireable to secure and promote the general welfare of the inhabitants of the municipality and the safety, health, peace, good order, comfort, convenience, morals, trade, commerce and industry of the municipality and the inhabitants thereof, and the enumeration of specific powers shall not be construed or held to be exclusive or as a limitation upon any general grant of power, but shall be construed and held to be in addition to any general grant of power. The exercise of the powers conferred under this section is specifically limited to the area within the corporate limits of the municipality, unless otherwise conferred in the applicable sections of the Consti-

tution and general laws, as amended, of the Commonwealth.

9. In light of the court's decision on the Eleventh Amendment issue, the court need not address the defendants' argument that the institutional defendants are not "persons" amenable to suit under § 1983.

10. By granting the motion, the court does not pass on the inherent merit of the concept of sovereign immunity. Many eminent scholars and jurists question the continuing validity of the concept of sovereign immunity in a modern democratic society, *see Hinchey*, 226 Va. at 242, 307 S.E.2d 891 (Cochran, J., dissenting), particularly in cases such as this where the issues are solely ones of federal constitutional law, *see Atascadero State Hosp.*, 473 U.S. at 301, 105 S.Ct. at 3177 (Brennan, J., dissenting). Such a philosophical task is beyond the scope of the present proceeding.

tions afforded by the Fourteenth Amendment and the Contract Clause do not extend to political subdivisions"); *Philadelphia v. Pennsylvania*, 508 F.Supp. 211, 213 n. 8 (E.D.Pa.1981) ("it is clear that a municipality does not have rights under [the Fourteenth] amendment").

Plaintiffs have offered nothing to contradict the clear weight of this authority, or to indicate that there has been any recent trend away from the strict application of this rule. Consequently, the defendants' motion to dismiss will be granted as to so much of the complaint as attempts to state claims on behalf of the County, the Board, the WBSS and WDSS, or Ann Carbaugh in her official capacity.

In light of the court's decision on the previous two matters, the issue remaining before the court may be simply stated: do the present plaintiffs have standing, in a representational capacity, to bring suit against defendant Jackson?

### C. *Representational standing*

Plaintiffs argue that they have standing and may therefore pursue this case as representatives for the citizens of the County whom they are charged to protect; two theories are put forward, *parens patriae* and organizational representation. These theories will be taken up separately.

In *Board of Supervisors of Fairfax County, Virginia v. United States*, 408 F.Supp. 556 (E.D.Va.1976), *appeal dismissed*, 551 F.2d 305 (4th Cir.1977), the court dealt with precisely the issue before this court—whether a County may bring suit as *parens patriae* for local citizens. The court concluded that a county may not avail itself of this doctrine.

The concept of *parens patriae* has its historical origins in the English constitutional system and the power of the King as sovereign. In the United States, the *parens patriae* function of the King passed to the States. [*Parens patriae*] literally means "parent of the country" and traditionally refers to the role of the state as sovereign and guardian of persons under its protection. Thus, the concept of *parens patriae* is closely linked

to that of sovereignty and has been most frequently applied where a state seeks to prevent or repair harm to its quasi-sovereign interests. Fairfax County, however, is not a sovereign, but rather a political subdivision whose powers are derivative of the sovereign State of Virginia.

*Id.* at 566 (citations omitted). *See also City of Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). In *Board of Supervisors of Fairfax County*, the county was suing the United States; the conclusion that a county may not sue as *parens patriae* is even clearer in a case such as the present, where the county is suing its creator, the state. The present plaintiffs do not have standing as *parens patriae* to sue to protect the rights of their citizens under the Fourteenth Amendment. The answer to the question of the County's organizational standing is less clear cut.

Where a party bringing suit does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a personal stake in the outcome of the controversy as to ensure that the dispute will be prosecuted in an adversary fashion and in a form historically viewed as capable of judicial resolution. *See Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). Even where an organization has not itself been injured, it is clear that a group whose *members* have been injured may represent those members in a proceeding for judicial review. *Id.* at 739, 92 S.Ct. at 1368. This is referred to variously as "organizational" or "associational" standing. The requirements for associational standing are that "(1) the members otherwise have standing; (2) the interest [the organization] seeks to promote is germane to its purpose; and (3) neither the claims asserted nor the relief requested require the participation of [the] member[s]." *Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 662 (4th Cir.), *cert. granted*, —— U.S. ——, 110 S.Ct. 49, 107 L.Ed.2d 18 (1989). A preliminary issue raised by the present

facts is whether any of the plaintiffs are the type of association or organization envisioned by the concept of associational standing.

■ If an association is a "voluntary membership organization," such as a typical trade association, then it has standing to sue in a representational capacity provided the requisite conditions are met. *See Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 342, 97 S.Ct. 2434, 2440, 53 L.Ed.2d 383 (1977). The plaintiffs in the present case are clearly not voluntary membership organizations; they are political subdivisions and related agencies. While *Hunt* created a limited exception to this requirement, the court found that the group bringing suit was essentially identical to a voluntary membership organization. *See Hunt*, 432 U.S. at 344, 97 S.Ct. at 2442 ("for all practical purposes [the commission] performs the functions of a traditional trade association").

Of some interest to the present case is the decision in *Meek v. Martinez*, 724 F.Supp. 888 (S.D.Fla.1987). In *Meek*, a number of plaintiffs challenged Florida's formula for allocating to various areas of the state federal funds received under the Older Americans Act of 1965, 42 U.S.C. § 3021, *et seq.* ("OAA"). The challenge was brought under 42 U.S.C. § 1983 alleging that the state funding formula violated the Equal Protection clause. Among the plaintiffs were two state senators and a local agency in charge of developing and implementing plans for the use of OAA funds within the agency's service area.[11] The defendant state of Florida challenged the standing of both the state senators and the local agency to bring suit.

The court, finding that the senators were suing only "on behalf of their constituents," dismissed them for lack of standing. *Id.* at 900. As to Florida's challenge to the standing of the local administrative agency the court stated:

Contrary to the State's allegation, the [local agency] is more than a creature of the state, established for the sole purpose of funnelling funds to service providers. Rather the OAA's legislative history reflects Congress's intention that the area agencies have the added function of serving as advocates on behalf of the needs of the elderly.

*Id.* at 901. In view of this specialized role, the *Meek* court felt that the local agency would come within the exception created by *Hunt*. *Id.*

Unlike the local agency in *Meek*, the present plaintiffs are no more than "creatures of the state." They have no special role as advocates for their citizens, at least not as to injuries to citizens arising from constitutional torts.[12] The Board of Supervisors in particular is much more akin to the state senators in *Meek*, who did no more than sue on behalf of their constituents. While this may be an altruistic endeavor, it is insufficient to give the Board standing. A review of the applicable state statutes reveals that the WBSS and WDSS have the duty to disburse funds and administer various social service programs but, again, have no special role which distinguishes them from other local governmental agencies. Thus, it appears that the present plaintiffs are not voluntary membership organizations, nor entities so closely akin to such organizations that they can fall within the *Hunt* or *Meek* exceptions.

A review of the cases cited by the plaintiffs does not indicate that the court should reach a different conclusion, particularly as a matter of federal law. Most of these cases are inapplicable for a variety of reasons. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) (plaintiff was the Commonwealth of Puerto Rico); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)

---

**11.** The OAA requires a state to be divided into segments referred to as "planning and service areas" (PSA). Florida created a separate agency for each PSA to bear the responsibility for administering services under the OAA.

**12.** See *Board of Supervisors of Fairfax County*, 534 F.Supp. at 566 (even if a county could sue in some situations as *parens patriae*, it could not do so to redress constitutional torts, the injury from which is personal to the affected citizens).

(actual injury found to have occurred to village, organizational standing not involved); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (no municipal plaintiff); *Peick v. Pension Benefits Guar. Corp.,* 724 F.2d 1247 (7th Cir.1983) (no municipal plaintiff).

Plaintiffs have also cited a trio of cases which concerns a related point. In *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), *Akron Board of Education v. State Board of Education of Ohio,* 490 F.2d 1285 (6th Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974) and *School Board of the City of Richmond v. Baliles,* 829 F.2d 1308 (4th Cir.1987), local boards of education were determined to have standing to sue various state agencies and officials under the Fourteenth Amendment. Defendants distinguish this line of cases by arguing that they all involved allegations of a fundamental right being impinged upon, or invidious discrimination being carried out. While it is true that all of these cases involved this type of allegation, an even more fundamental distinction exists between these three cases and the present case.

The essence of standing is the finding that a party has a "personal stake" in the outcome of a controversy. *Sierra Club,* 405 U.S. at 732, 92 S.Ct. at 1364. In *Allen, Akron Board of Education,* and *School Board of the City of Richmond* the courts consistently found that state actions forced local officials into a position where they were forced to make a personal choice between comporting with the constitution or complying with state requirements. *Allen,* 392 U.S. at 241, n. 5, 88 S.Ct. at 1925, n. 5; *Akron Board of Education,* 490 F.2d at 1291; *School Board of the City of Richmond,* 829 F.2d at 1311. This choice between following state law or violating their oath to uphold the federal constitution was found to give the plaintiffs the necessary personal stake in the proceedings. *Allen,* 392 U.S. at 241, n. 5, 88 S.Ct. at 1925, n. 5.[13] In the present case the state funding policy

creates no such conflict. State and federal law require the county to provide certain social services, but these same laws do not necessarily dictate where the funding for those services should come from. This court can discern no constitutional requirement that they come from the state. The state action does not place the plaintiffs in any conflict, certainly not any conflict with a duty to uphold the constitution; it merely gives them less money than they would like with which to provide services. While the court recognizes the problems that dwindling federal funds have created for local governments, they are not problems which give the present plaintiffs a sufficiently personal stake in the outcome of this action. This, when coupled with the status of the plaintiffs as political subdivisions of the Commonwealth, and with the fact that they have no rights of their own under the Fourteenth Amendment, leads the court to conclude that the present plaintiffs do not have standing to pursue this action as organizational or associational plaintiffs. Consequently, the remainder of the claims in this action shall be dismissed.

### III

In conclusion, the court finds that the Eleventh Amendment bars suit against either the State Board of Social Services or the State Department of Social Services. The plaintiffs in this case, political subdivisions of the Commonwealth of Virginia, have no rights, in their own capacity, under the Fourteenth Amendment, as against the Commonwealth, and have therefore failed to state a claim under that Amendment. Finally, these plaintiffs may not pursue this case under the organizational or associational theory of standing. This action shall therefore be dismissed.

An appropriate Order shall this day issue.

---

13. Additionally, in both *Akron Board of Education,* 490 F.2d at 1290, and *School Board of the City of Richmond,* 829 F.2d at 1311, the courts also found that the school boards would have standing because of actual economic harm flowing to them as a result of state action.